**FILED UNDER SEAL**

Julian Brew (SBN 150615)
jbrew@hechtpartners.com
**HECHT PARTNERS LLP**
6420 Wilshire Boulevard, 17th Floor
Los Angeles, CA 90048
Telephone: 310-804-8065
Facsimile: 646-492-5111
Attorneys for Plaintiff-Relator,
**RELATOR LLC**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>*ex rel.* **RELATOR LLC**, a California limited liability company,<br><br>Relator,<br><br>v.<br><br>**JAMES DUFF**, an individual; **THOMAS DUFF**, an individual; and **DUFF CAPITAL INVESTORS LLC**, a Mississippi Limited Liability Company, **SOUTHERN TIRE MART, INC.**, a Mississippi Corporation, **PINE BELT MOTORS, LLC,** a Mississippi Limited Liability Company, **PINE BELT CDJR, INC.** a Mississippi corporation; and DOES 1-10,<br><br>Defendants. | Case No. **CV24    1002**<br><br>**COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT**<br><br>**FILED *IN CAMERA* UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**DO NOT PLACE ON PACER**<br><br>**JURY TRIAL DEMANDED** |

FILED
FEB 20 2024
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

---

COMPLAINT

FILED UNDER SEAL

**JAMES DUFF**, an individual, **THOMAS DUFF**, an individual, **DUFF CAPITAL INVESTORS LLC**, a Mississippi Limited Liability Company, **SOUTHERN TIRE MART, INC.**, a Mississippi Corporation (hereinafter "STM"), **PINE BELT MOTORS, LLC**, a Mississippi Limited Liability Company, (hereinafter "PBM"), **PINE BELT CDJR, INC.** a Mississippi corporation (hereafter "PBC", together with STM and PBM, hereinafter, collectively known as the "DCI Companies"); and DOES 1-10.

## JURISDICTION & VENUE

1.    This Court has subject matter jurisdiction over the Plaintiff's claims brought under the FCA, 31 U.S.C. §§ 3279, et seq., pursuant to 31 U.S.C. §§ 3730 and 3732. This Court has supplemental jurisdiction to entertain the common law and equitable causes of action under 28 U.S.C. § 1367(a).

2.    Plaintiff The United States of America is also located in the Northern District of California. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because at all times material hereto, Defendants transacted business and are located in the Northern District of California, and acts proscribed by 31 U.S.C. § 3729 occurred in this district.[1]

3.    Venue is proper in this district pursuant to 31 U.S.C. § 3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a), because the Defendant's acts that form the basis of this Complaint occurred in the Northern District of California.

4.    Relator's claims and this Complaint are not based upon prior public disclosures of allegations or transactions in a federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation; or from the news media. To the extent that there has been a public

---

[1] Southern Tire Mart, LLC has formed an operating entity in California, and transacts business throughout California including many in the Bay Area, with a store located at 140 Hegenberger Loop, Oakland, California 94621.

2

COMPLAINT

FILED UNDER SEAL

disclosure unknown to Relator, it is the "original source" within the meaning of 31 U.S.C. § 3730(e)(4)(B) and/or the public disclosure is a result of Relator voluntarily providing this information to the United States Government prior to filing this *qui tam* action.

## INTRODUCTION AND SUMMARY

5.    In this matter two billionaire brothers, reported to be the wealthiest two individuals in Mississippi, used a handful of their many companies, including STM (the largest commercial tire dealer and retread manufacturer in North America), and PBM and PBC, to misappropriate millions of dollars from the US Federal government's Paycheck Protection Program ("PPP"). These companies are all part of the same multi-billion-dollar conglomerate, Duff Capital Investors LLC (owned by brothers James and Thomas Duff) and had absolutely no need for any type of financial assistance, let alone financial assistance from the US government. Defendants submitted falsified loan documents to the SBA to get the loans. Defendants did not meet the required level of economic uncertainty necessitating any assistance loans. In 2020 Defendant's conglomerate showed no indication of any business slowdown, let alone a financially ruinous one. Even if Defendants did have some business slowdown, which they did not, their conglomerate was more than capable of drawing upon its own vast financial reserves to pay its employees. According to their own LinkedIn page: "Southern Tire Mart is the largest commercial tire dealer and retread manufacturer in North America." The two Duff brothers are both multi-billionaires. They are the two richest people in the state of Mississippi. They own Duff Capital Investors LLC[2], which is their very own well-financed investment firm with access to significant capital. There was no need for the loans, and certainly no need to get money from the US government as opposed to their own corporate coffers. Defendants simply took advantage. Defendants had no economic

---

[2] Duff Capital Investors LLC is headquartered at the same exact office location as Southern Tire Mart LLC, and has the same owners, the Duff brothers.

3

COMPLAINT

FILED UNDER SEAL

necessity to get the loans to save their businesses. Ongoing business operations were not threatened without the loans. Later, Defendants additionally falsified additional documents which were presented to the government to obtain total loan forgiveness, billing millions to the US taxpayer.

6.      The individual defendants used their conglomerate's subsidiaries, the DCI Companies, to apply for and receive multiple PPP loans totaling $6,781,092.78 purportedly to pay for payroll. However, the DCI Companies and the Duff Brothers who controlled them:

a.      Falsified loan eligibility;

b.      Falsified their status as "small business" concerns;

c.      Falsified that they were not dominant businesses in its field;

d.      Falsified number of jobs;

e.      Falsified the use of the loans on authorized expenses;

f.      Falsified the economic necessity for the loans; and

g.      Falsified eligibility for loan forgiveness.

7.      **The DCI Companies are Affiliates and Owned and Controlled by Duff Capital Investors LLC**. The DCI Companies are each a subsidiary and wholly owned and controlled by their parent company, Duff Capital Investors LLC and its owners James Duff and Thomas Duff. STM is "the largest commercial tire dealer and retread manufacturer in North America" according to them. The DCI Companies all have the same executive team, James Duff and Thomas Duff. They are all listed on the Duff Capital Investors website as comprising the same company. They are essentially the same company. At a minimum, the DCI Companies are all affiliates and subject to the SBA's affiliation rules for PPP loans.

The DCI Companies, together with their other affiliates which are wholly owned and controlled by Duff Capital Investors LLC and ultimately the Duff bothers, have more than 10,000 employees according to their own LinkedIn page and reports by third parties. This is a large and expansive conglomerate.

COMPLAINT

FILED UNDER SEAL

8. **Falsified Loan Eligibility - Failure to Apply Affiliation Rules**. Relator is informed and believes that the DCI Companies are directly or indirectly, wholly owned and controlled by Duff Capital Investors LLC, a holding company with annual turnover in excess of $2.6 billion according to Wikipedia. Duff Capital Investors LLC is the Duff brothers' personal investment firm with more than 20 portfolio companies, like the DCI Companies. The SBA's Affiliation Rules require that the total number of an applicant's employees plus the employees of affiliates under common control be included in any calculation to determine if a borrower is a "small-business concern." The DCI Companies failed to include the number of employees of its parent company and its other portfolio companies in the total employee number calculation and therefore misstated that it was a small business concern. Just as important, the DCI Companies who all took PPP loans had access to capital from their well capitalized parent corporation and therefore did not have the requisite economic necessity for the half dozen PPP Loans they took.

9. **Duff Capital Investors LLC Affiliates – Access To Capital**. Instead of the US government, the DCI Companies could have and should have sought financial assistance from their own parent company or affiliates, if they actually needed money. Defendant companies had financially powerful investment partners, who could have readily provided them any financial assistance needed. These affiliates (and STM itself) have access to vast stores of capital and could have easily provided assistance money, again assuming they actually needed it. STM is "the largest retreader in the country —with its daily production eclipsing that of three different tire manufacturers" according to Modern Tire Dealer Magazine.[3]

10. **The DCI Companies' Affiliates – Size Prohibitions**. Together, parent company and the affiliates of the DCI Companies also have far in excess of the 500

---

[3] Modern Tire Dealer Magazine, September 13, 2021.

5

COMPLAINT

FILED UNDER SEAL

employees maximum, and also grossly exceed the annual revenue maximums, as their revenues are in the billions of dollars. When these affiliates are counted in addition, they also render Defendant ineligible. Just STM alone has 1,300 employees with an annual revenue of $600,000,000. Duff Capital Investors LLC has over 10,000 employees. This group of affiliated companies, all under the common control and ownership of the Duff brother, is far too big to be eligible, and they make far too much money to be eligible.

11. **Falsified Number of Employees**. Defendants lied about being a small business, under 500 employees. STM is widely reported to have 1,300 employees. Duff Capital Investors LLC has over 10,000 employees. Defendants deceptively *underreported* their true job numbers to avoid being disqualified. They have and had many more than 500 employees. In its loan applications STM deceptively claimed to have 496 employees, it is a fabricated number which was falsely provided by Defendants to avoid disqualification at the 500-employee threshold. STM and her sisters are not a "small business" but rather a large business with an astronomical annual revenue reported between in the billions of dollars.

12. **Deception Scheme for False Jobs Reported**. STM was ineligible to receive a PPP loan because it was not a small business. On its loan application, STM certified that it employed "no more than the greater of 500 employees or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry." STM claimed to only have 496 employees, whereas they had much more than 500 at the time of the application and the true, actual number is more than allowed for eligibility, and would make them ineligible. This figure is carefully fabricated, and reveals the deceptive intentions of the Defendants. The Defendants deliberately decided to report the exact figure 496 in order to deceptively suggest that they are not purposefully trying to report a number under 500, such as a reported number like 499 might suggest. 496 reveals

6

COMPLAINT

FILED UNDER SEAL

the extent of planning and consideration the Defendant undertook in its scheme. There is no head count of Defendant's actual jobs numbers which could have led them to report 496. *This is a totally fabricated figure*. In falsely claiming they had less than 500 employees, STM claimed to have a number of employees that would make it eligible for a PPP loan. However, if STM had more than 500 employees and was therefore ineligible because it was not a small business at the time it applied for the loan. Furthermore, the SBA's size standard for businesses in the tire retreading industry (NAICS Code 326212) was 500[4] as of the date STM's loan was approved[5], and Relator is informed and believes that STM annual receipts were well in excess of $1.6 billion. Therefore, STM was not and *could not* have been a small business and was not eligible to apply for and receive the PPP Loan.

13.    **STM Cannot Qualify As "Small Business"**. Small business concerns can be eligible borrowers even if they have more than 500 employees, as long as they satisfy the existing statutory and regulatory definition of a "small business concern" under section 3 of the Small Business Act, 15 U.S.C. 632. 15 U.S. Code § 632 (a) (1) generally defines small business concerns as businesses which are "not dominant in its field of operation." Defendant is a highly successful and large business. As the LARGEST commercial truck tire dealer and tire retreading company in the country, it is *dominant in its field*. Therefore, it falsely certified that it fits within the definition of a small business concern because a small business for this loan must not be dominant in its field. These loans are intended for vulnerable companies, susceptible company, endangered companies in financial trouble, companies *that do not have*

---

[4] https://www.ecfr.gov/current/title-13/chapter-I/part-121

[5] The size standards themselves are expressed either in number of employees or annual receipts in millions of dollars, unless otherwise specified. The number of employees or annual receipts indicates the maximum allowed for a concern and its affiliates to be considered small.

COMPLAINT

FILED UNDER SEAL

*vast oceans of money to draw upon.* The PPP was not for companies that could have easily weathered the pandemic, like the Defendants.

14.    **No Economic Necessity.** There is no evidence that the DCI Companies had any, let alone *sufficient*, economic uncertainty to make a loan necessary to support ongoing operations. It is reported that STM actually hit peak revenue in 2022, at an astronomical $1.6 billion.  The DCI Companies and their many affiliated sister companies were doing financially well during the pandemic. It was widely reported that truck/car sales increased during the pandemic. It stands to reason that tire and truck sales were not negatively affected from the pandemic and may have even increased as people spent extra income on goods  (which needed transportation by truck and tire) rather than services outside the home.

15.    They did not have enough uncertainty to justify a loan from the SBA, let alone *any* economic uncertainty or financial losses in 2020 when it applied for the loan. There were no mass layoffs, no office closures, no shrinking of services or anything indicating dire financial conditions. In fact, quite the opposite. Just recently STM announced that it was moving to a new state of the art headquarters in Texas.

16.    **Financial Success 2020-2021.** As of September 2021, STM was on track to hit its largest sales figure of $2 billion, it is reported that in 2021 STM expanded its business by launching a major new initiative – a joint co-branded venture with Pilot Flying J, one of the largest truck stop chains in the US. This major expansion under the Duff Capital Investments umbrella would not have been possible if Defendants were not financially stable. This expansion was a major conquest. It reveals that Defendants were spending their money on growing their business, rather than barely surviving.

The PPP was made to help struggling businesses which were unsure about being *able* to pay their utility bills, rent and workers. The Second certification in the application was: "Current economic uncertainty makes this loan request

8

COMPLAINT

FILED UNDER SEAL

necessary to support the ongoing operations of the Applicant." The word "necessary" is important. The SBA required that the COVID pandemic caused enough economic uncertainty such that company payroll was jeopardized. That is a distinct standard. It is not enough that there was some economic uncertainty. The uncertainty must be adverse enough to threaten payroll. There must be sufficient economic uncertainty, such that the company's engine room and most important asset, its people, were threatened with economic troubles. In other words, the business must be on life support. The business must have been in trouble to the point where its most important resource, its people, were not affordable any longer. The PPP was not a free excuse to raid government coffers by wealthy businessmen.

STM did not *need* the loans to pay its workers, by any stretch of the imagination – there was no "need" or "economic necessity" to pay Defendant's basic expenses.[6] STM did not and cannot show any decline in revenue during the pandemic, much less a decline so precipitous it threatened worker pay. In fact, since much of STM's business relied on commercial retreading for shipping companies, it was evident at the outset of the pandemic with much of peoples' needs being shipped to their homes that STM's business was going to substantially benefit from the pandemic lockdowns, which is in fact what happened. There was no good faith belief that the loan was necessary to maintain STM's business operations.

Furthermore, apart from the conglomerate of STM companies, they had partner/investors who they could have turned to, including Duff Capital Investors, LLC or the Duff brothers, who had billions in ready assets to draw upon.

---

[6] STM is not a small business in dire financial straits, but rather a large, well-financed company with ample resources to get through any financial downturn. This is not to mention their parent company, which also had billions of dollars to draw upon to assist its subsidiaries. Public information shows their revenue was not declining, and their own statements indicate massive growth and profits. Defendant cannot show "economic necessity" in needing the loans to continue business operations.

FILED UNDER SEAL

Yet Defendants falsely certified they had "economic uncertainty" so dire that they needed a massive loan from the US taxpayers to keep their lights on, literally. This was a massive lie.

17. **Defendants Deceptively Omitted Each Other's Employees.** The affiliation rules require that employees of all affiliates be added to the count of employees for the borrower. All of the Defendants failed to do that. They omitted the employee counts of their other affiliates. Each of the DCI Companies separately falsified their employees count on their respective applications, omitting the employees of their sister companies and parent company Duff Capital Investors LLC:

- STM deceptively omitting the 84 employees of affiliate PBM and 61 employees of PBC;

- PBM and PBC deceptively omitting each others' employees and the 1,600 employees of affiliate STM; and

- Each of the DCI Companies deceptively omitting the 10,000 employees of parent and affiliate Duff Capital Investors LLC, and their many sister companies/affiliates that are wholly owned and controlled by Duff Capital Investors LLC and the Duff brothers.

18. **Money Not Returned.** The loan was taken by a business which was not allowed to take even one penny in loans, let alone millions of dollars. However, at some point the defendants could have changed course. They could have returned the money. They did not. They doubled down on their misappropriation by seeking loan forgiveness. The more than $6.7 million dollars in funds should have been returned immediately. These loans should never have been sought in the First place. Yet the Defendants went further by obtaining total loan forgiveness, billing the US taxpayers millions of dollars. *Defendants have not returned the loan proceeds to this day.*

19. **Falsification on Loan Forgiveness.** Defendants falsified further documents to receive loan forgiveness. Defendants had to attest as to the use of the

COMPLAINT

FILED UNDER SEAL

funds and the amount used on authorized purposes. They were not because Defendants could not comply with the requirements of forgiveness given their business type. So, Defendants also lied on their forgiveness documents and application.

20.    **Defendant's False Statements and Fraud**. Defendants knowingly and intentionally made many materially false statements to the government and bank to obtain the loans.

21.    Plaintiff brings this action as relator on behalf of the United States to recover treble damages, civil penalties, and costs under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33 Plaintiff gave notice of its intent to file and full disclosure of the evidentiary basis to the Department of Justice ("DOJ").

## THE PARTIES

22.    Plaintiff is a California limited liability company with its principal place of business in Los Angeles County, California.

23.    Defendant James Duff is an individual and, at all relevant times herein, is and was, directly or indirectly, the co-owner and co-director of Duff Capital Investors, LLC, and the DCI Companies.

24.    Defendant Thomas Duff is an individual and, at all relevant times herein, is and was, directly or indirectly, the co-owner and co-director of Duff Capital Investors, LLC, and the DCI Companies.

25.    Defendant Duff Capital Investors LLC is a Mississippi Corporation formed in 2012 with its principal place of business in Columbia, Mississippi.

26.    Defendant STM is a Mississippi Corporation formed in 1973 with its principal place of business located at Columbia, Mississippi.

27.    Defendant PBM is a Mississippi Corporation formed in 2014 with its principal place of business in Hattiesburg, Mississippi.

28.    Defendant PBC is a Mississippi Corporation formed in 1951 with its

11

COMPLAINT

FILED UNDER SEAL

principal place of business in Columbia, Mississippi.

29.    STM is a privately held, privately funded/backed, for profit corporation and is the largest commercial tire dealer and retread manufacturer in North America. PBM and PBC are both privately held, privately funded/backed, for profit corporations and large auto dealers.

30.    The true names and capacities, whether individual, partner, associate, corporate or others, of Defendant DOES 1 through 10, inclusive, and each of them, are unknown to Plaintiff, who therefore sues said Defendant(s) by such fictitious names.  Plaintiff is informed and believes and thereon alleges that each Defendant designated herein as a "DOE" is legally responsible in some manner for the events and happenings herein mentioned.  Plaintiff will seek leave of Court to amend this Complaint to reflect the true names and capacities of said DOES, and add appropriate charging allegations against said DOES when their identities have been ascertained. Plaintiff is informed and believes that each of the DOE Defendants were responsible in some manner for the injuries and damages alleged herein, and/or for the wrongful acts of some or all of the Defendants.

31.    Plaintiff is further informed and believes that each of the Defendants, whether specifically named or named as a DOE, was an agent, employee, servant and/or representative of each of the remaining Defendants, and, in doing or failing to do the things alleged herein, was acting within the course and scope of said agency, employment, service and/or representation.

32.    Plaintiff is further informed and believes that each of the Defendants, whether specifically named herein or named as a DOE, approved, ratified and/or acquiesced in the acts and omissions of each of the remaining Defendants.

33.    Plaintiff is further informed and believes that each of the Defendants herein, whether named as DOES or others, acted in concert, agreement and conspiracy with the other Defendants for the common purpose of engaging in a scheme to defraud as alleged below.

COMPLAINT

FILED UNDER SEAL

## THE CARES ACT AND PAYCHECK PROTECTION PROGRAM

34.    On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act" or "the Act") (Pub. L. 116-136) became law and provided emergency assistance and health care response for eligible individuals, families, and businesses affected by the coronavirus pandemic. SBA received funding and authority through the Act to modify existing loan programs and establish a new loan program to assist small businesses nationwide adversely impacted by the COVID-19 emergency.

35.    The CARES Act authorized loans to eligible small businesses struggling to pay employees and stay in business as a result of the devastating effect of the COVID-19 pandemic and resulting restrictions.

36.    Section 1102 of the CARES Act temporarily permitted the SBA to guarantee 100 percent of 7(a) loans under a new program titled the "Paycheck Protection Program" ("PPP").

37.    On April 24, 2020, the Paycheck Protection Program and Health Care Enhancement Act (Pub. L. 116-139) was enacted to provide additional funding and authority for the PPP. On June 5, 2020, the PPP Flexibility Act of 2020 (Flexibility Act) (Pub. L. 116-142) was enacted, changing key provisions of the PPP, including provisions relating to the maturity of PPP loans, the deferral of PPP loan payments, and the forgiveness of PPP loans.

38.    Under the PPP, in 2020, eligible businesses could obtain one SBA guaranteed PPP loan. Businesses were required to spend all loan proceeds only for employee compensation, rent or mortgage, and certain other specified expenses. Depending on their use of the loan proceeds as certified, they could qualify for loan forgiveness, up to the full amount of the loan.

39.    The SBA delegated authority to third-party lenders to underwrite and approve the PPP loans. In order to obtain a PPP loan, whether a "First Draw" or "Second Draw" loan, an eligible business (through its authorized representative) had

13

COMPLAINT

FILED UNDER SEAL

to sign and submit a PPP loan application (SBA Form 2483) online through the lender's platform. The PPP loan application (SBA Form 2483) required the business (through its representative) to acknowledge the PPP program rules and make certain certifications in order to be eligible to obtain the PPP loan, including certifying that their certifications were true.

40.    Once the Borrower submitted its PPP loan application (SBA Form 2483) to a Lender, the participating lender processed the PPP loan application. If a PPP loan application (SBA Form 2483) was approved by the lender, it funded the PPP loan with its own funds, which were 100% guaranteed by the SBA.

41.    After the Lender processed and approved a borrower's PPP loan application (Form 2483), but prior to the closing of the PPP loan, the Lender submitted to the SBA, the Lender's Application - Paycheck Protection Program Loan Guaranty (SBA Form 2484) to the SBA applying for a guarantee on the loan. For a PPP loan to be approved, the Lender was required to Answer Yes to the following questions in the Lender's Application - Paycheck Protection Program Loan Guaranty (SBA Form 2484) as to the Borrower's certification of its General Eligibility to receive a PPP Loan:

| | | Yes | No |
|---|---|---|---|
| • | The Applicant has certified to the Lender that (1) it was in operation on February 15, 2020, has not permanently closed, and was either an eligible self-employed individual, independent contractor, or sole proprietorship with no employees or had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099MISC; (2) current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant; (3) the funds will be used to retain workers and maintain payroll, or make payments for mortgage interest, rent, utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker | | |

COMPLAINT

FILED UNDER SEAL

| | protection expenditures; and (4) the Applicant has not and will not receive another loan under the Paycheck Protection Program, section 7(a)(36) of the Small Business Act (15 U.S.C. 636(a)(36)) (this does not include Paycheck Protection Program Second Draw loans, section 7(a)(37) of the Small Business Act (15 U.S.C. 636(a)(37)). | | |
|---|---|---|---|

SBA Form 2484 (emphasis added). Therefore, if a PPP borrower lied on its PPP loan application (SBA Form 2483), the PPP borrower's false certification caused the Lender to submit to the SBA with respect to that PPP Loan, a Lender's Application - Paycheck Protection Program Loan Guaranty (SBA Form 2484) that contained the PPP borrower's False Statement.

42.     SBA Form 2483 includes the following certification, among others: "I have read the statements included in this form, including the Statements Required by Law and Executive Orders, and I understand them" (the "Understanding Certification").

43.     SBA Form 2483 also includes the following certification, among others: "The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule)" (the "Eligibility Certification").

44.     SBA Form 2483 also includes the following certification, among others "All SBA loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule" (the "Use of Proceeds Certification").

45.     SBA Form 2483 also includes the following certification, among others: "Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant" (the "Economic Necessity Certification").

46.     SBA Form 2483 also includes the following certification, among others:

"The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud" (the "Worker Retention and Payroll Certification").

47.    SBA Form 2483 also includes the following certification, among others: "During the period beginning on February 15, 2020 and ending on December 31, 2020, the Applicant has not and will not receive another loan under the Paycheck Protection Program." (the "Single Loan Certification").

48.    SBA Form 2483 also includes the following certification, among others: "I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000" (the "No False Statements Certification").

49.    After the borrower submitted a PPP loan application, it was processed by the participating lender. If the PPP loan application was approved, the participating lender funded the loan using its own monies, which were then guaranteed by the SBA. Generally, in the event the borrower defaulted on a PPP loan, the SBA would purchase the borrower's debt from the lender and be responsible for its repayment.

50.    Under applicable SBA rules and guidance, recipients of PPP loans could apply to have principal and interest on the PPP loan fully forgiven, meaning that the borrower would owe nothing and would have no obligation to repay the PPP loan.

COMPLAINT

FILED UNDER SEAL

To obtain full forgiveness of the PPP loan, borrowers had to attest that they had "not reduced the number of employees or the average paid hours of [their] employees" during the loan period, that the loan proceeds had been spent on payroll costs and other permitted expenses and that at least 60% of the loan proceeds had been spent on payroll costs (hereafter the "Loan Forgiveness Certification").

51.    Loans could only be used for certain permitted expenses, such as to pay employees' salaries, employee benefits, mortgage interest, rent, utilities or worker protection costs related to COVID19.

52.    More specifically, the loan forgiveness application (SBA Form 3508), revised as of July 30, 2021, included the following certifications, among others:

(1)    The dollar amount for which forgiveness is requested:

- was used to pay costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; or business utility payments);

- includes all applicable reductions due to decreases in the number of full-time equivalent employees and salary/hourly wage reductions;

- includes payroll costs equal to at least 60% of the forgiveness amount;

- if a 24-week Covered Period applies, does not exceed 2.5 months' worth of 2019 compensation for any owner-employee or self-employed individual/general partner, capped at $20,833 per individual; and

- if the Borrower has elected an 8-week Covered Period, does not exceed 8 weeks' worth of 2019 compensation for any owner-employee or self-employed individual/general partner, capped at $15,385 per individual.

(2)    I understand that if the funds were knowingly used for

COMPLAINT

FILED UNDER SEAL

unauthorized purposes, the federal government may pursue recovery of loan amounts and/or civil or criminal fraud charges.

(3)    The Borrower has accurately verified the payments for the eligible payroll and nonpayroll costs for which the Borrower is requesting forgiveness.

(4)    The Borrower's eligibility for loan forgiveness will be evaluated in accordance with the PPP regulations and guidance issued by SBA through the date of this application.

53.    On April 23, 2020 in FAQs No. 31, the SBA reiterated that the economic necessity certification must be made in good faith and that publicly traded companies are not likely to be able to make that certification in good faith, stating "it is unlikely that a public company with substantial market value and access to capital markets will be able to make the required certification in good faith…"

## DEFENDANTS' FRAUD

54.    During round 1 of the PPP, Defendant STM applied for a PPP loan for $5,519,845.00. It was approved on April 11, 2020, by the SBA for the full amount, which was disbursed. The loan was facilitated by Trustmark National Bank. Defendant received 100% of the approved amount. On its application for this loan, Defendant stated that it had 496 employees for which it needed the loan, just 4 employees short of the maximum number before sized out of eligibility altogether. This loan was forgiven on June 11, 2021.

55.    During round 1 of the PPP, Defendant PBM applied for a PPP loan for $803,048.00. It was approved on April 8, 2020, by the SBA for the full amount, which was disbursed. The loan was facilitated by Trustmark National Bank. Defendant received 100% of the approved amount. On its application for this loan, Defendant stated that it had 84 employees for which it needed the loan. This loan was forgiven on June 11, 2021.

56.    During round 1 of the PPP, Defendant PBC applied for a PPP loan for

COMPLAINT

FILED UNDER SEAL

$458,200.00. It was approved on April 11, 2020, by the SBA for the full amount, which was disbursed. The loan was facilitated by Trustmark National Bank. Defendant received 100% of the approved amount. On its application for this loan, Defendant stated that it had 61 employees for which it needed the loan. This loan was forgiven on June 11, 2021.

57.     The Duff brothers, are sophisticated, experienced businessman. They knew about the restrictions or certainly should have known about them. The legal and financial experts they hired in the more than 20 companies covering thousands of employees over the years, should have known or would have known about the loan rules also. The Defendants intentionally broke these clear rules knowing what they were doing. They would have quickly discovered that the PPP Loan was not permitted, especially given the amounts involved and important of reporting correct information to the government.

58.     The Defendants knew when they claimed that STM had only 496 employees that such a statement was false, blatantly false. STM did not have 496, but in truth they had more than *triple* that number, 1,300. Their parent affiliate, Duff capital Investors LLC had 10,000 employees, not to mention their other affiliates like PBM. If the true and correct number of their employees was reported by any of these Defendants, including STM, they would not be eligible to obtain any PPP loans, because they would not be considered a small business. If STM had more than 496 employees it could not qualify as a small business under the size standard principal either, as that maximum was also 500 at the time of the loan application in April 2020.

59.     In addition to applying any applicable business type ineligibility rules, all borrowers should carefully review the required Economic Certainty certification on the Borrower Application Form stating that ''[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.''

COMPLAINT

FILED UNDER SEAL

60.    Defendants abused the PPP program, from misrepresenting a non-existent economic need necessitating a loan to keep the business from dying, to willfully ignoring ineligibility rules and then finally obtaining loan forgiveness. Discovery will reveal where the millions in PPP funds were actually spent, but what is obvious is that Defendants *did not need any money from US taxpayers*. STM and the Duff Capital Investors LLC were highly profitable during the pandemic, and continue to dominate the tire industry in all of North America. They did not suffer any business loss and certainly had the money to pay their own worker wages.

61.    Defendants signed the loan applications, thereby endorsing the Understanding Certification, which means that they agreed that they understood the rules and guidelines of the PPP, including, without limitation the rules regarding use of proceeds and the certifications made.

62.    The proceeds of the PPP Loans were not and could not have been used only for authorized purposes consistent with the PPP Rule, because, among other things, the Defendant was obviously not allowed to apply for PPP loans because of their ready access to money as a financially back company with investment partners, their company size, more than 500 employees, and lack of economic uncertainty. Therefore, when Defendants made the Use of Proceeds Certification, the certification was false.

63.    The proceeds of the PPP Loans were not necessary to support the ongoing operations of STM. The company was nowhere near a financial precipice. Far from it. The company enjoyed business growth and successes, in 2020 until today. This company had considerable financial resources to pay its own utilities, rent and workers, assuming that is where the money was spent rather than into the pocket of the CEO and its executives. Therefore, when Defendants made the Economic Necessity Certification, the certification was false.

64.    The PPP loan money was only allowed to be used on *authorized* expenses. The proceeds of the PPP Loan were not permitted to be used business costs

**FILED UNDER SEAL**

which were affordable to Defendants without the loan. Therefore when Defendant made the Worker Retention and Payroll Certification, the certification was false.

65. By virtue of the above false statements, when Defendants made the No False Statements Certification, that certification was false.

66. The Defendants actively pursued and obtained loan forgiveness. Because STM is prohibited from obtaining any PPP loans, its representation on its forgiveness application that it spent 100% of the loan proceeds on eligible expenses was not truthful. The SBA would not have forgiven the loans if they knew Defendants' certifications described above were false. They also would not have forgiven the loans if they knew the proceeds had been used to increase profits instead of paying their employees.

67. As a result of the forgiveness, Defendants have not repaid the loan and have kept the proceeds, and the loan has been repaid with money from taxpayers, including the small businesses and owners who were supposed to receive the PPP funds.

### THE FALSE CLAIMS ACT

68. The False Claims Act prohibits fraudulent conduct in connection with federal programs, including the knowing submission of false claims for payment to the government. See 31 U.S.C. § 3729(a)(1)(A). In these circumstances, liability may attach if the omission renders those representations misleading. 41. 31 U.S.C. § 3729(a)(1)(A) and (B) of the FCA provide that:

(1) . . . any person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim,

. . .

(G) knowingly makes, uses, or causes to be made or used, a false

21

COMPLAINT

FILED UNDER SEAL

record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government . . .

> 31 U.S.C. § 3729(a)(1)(A), (B), and (G) (2020).

42. The scope of a false or fraudulent claim is to be broadly construed. As used in the FCA, a "claim"

> (A) means any request or demand, whether under a contract or for money or property and whether or not the United States has title to the money or property, that—

> (i) is presented to an officer, employee, or agent of the United States; or

> (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

> (I) provides or has provided any portion of the money or property requested or demanded; or

> (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; . . .

> 31 U.S.C. § 3729(b)(2) (2020).

69. A person who violates the False Claims Act during the time period at issue "is liable for a civil penalty as adjusted, plus 3 times the amount of damages which the United States Government sustains because of the act of that person." 31 U.S.C. § 3729(a). See 28 C.F.R. § 85.3(a)(9); Department of Justice, 28 CFR Part 85, Civil Monetary Penalties Inflation Adjustments for 2022 published at: https://www.govinfo.gov/content/pkg/FR-2022-05-09/COMMERCE/2022-09928.COMMERCE.

22

COMPLAINT

FILED UNDER SEAL

## FIRST CAUSE OF ACTION

### FALSE OR FRAUDULENT CLAIMS (31 U.S.C. § 3729(a)(1)(A-B))

70. Plaintiff alleges and incorporates by reference each and every allegation contained in all prior paragraphs of this complaint.

71. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

72. By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States government, false or fraudulent claims for payment or approval, in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A). Specifically, each of Defendants' Economic Necessity, No False Statements, Eligibility, Use of Proceeds, Understanding, Worker Retention and Payroll Certifications described above all were knowingly false, and relied upon by lenders and the SBA in approving the PPP Loans. Their request for forgiveness contained a further misrepresentation that the loans had been used only for authorized purposes.

73. By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims for payment by the Government.

74. The Government and its agents and contractors relied on those false statements in approving and making the loans and subsequently forgiving them, leaving the burden of repayment on taxpayers.

75. Because of the Defendants' acts, the United States sustained damages in an amount to be determined at trial and, therefore, is entitled to treble damages under the FCA, plus civil penalties of not less than $12,537.00 and not more than $25,076.00 for each and every violation arising from Defendants' unlawful conduct alleged herein, and attorneys' fees in an amount to be proven.

### CONCLUSION

76. This is a glaring example of two wealthy billionaires taking advantage

COMPLAINT

FILED UNDER SEAL

of the system. The Duff brothers and their companies looted the government. Just one of their companies STM, is the largest tire deal and retreader in North America. They had other companies that were also successful. They are billionaires. Their companies have billions of dollars at their disposal and access to immense further resources. Compare this to the average American business that was actually hurt by the pandemic. The disparity and level of greed is shocking. The American people have a right to reconciliation.

## PRAYER FOR RELIEF

WHEREFORE, qui tam Plaintiff/Relator prays for judgment against Defendants, as follows:

1. That this Court enter judgment against each Defendant in an amount equal to three times the damages that the United States has sustained because of Defendants' action, plus a civil penalty of not less than $12,537.00 and not more than $25,076.00 for each and every false claim as are required by law, together with all such further relief as may be just and proper.

2. Such other relief as this Court may deem just and proper, together with interest and costs of this action.

3. Reasonable attorney fees, litigation expenses, and costs of suit.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: February 20, 2024                    HECHT PARTNERS LLP

By: _____

JULIAN BREW
Attorneys for Plaintiff-Relator
RELATOR LLC

24
COMPLAINT